# AFFIDAVIT IN SUPPORT OF
# APPLICATION FOR SEARCH WARRANT

I, Jason Kimmel, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by Oath Inc., which wholly owns AOL, Inc. (collectively herein referred to as "AOL" or the "Provider"), an e-mail provider headquartered at 22000 AOL Way, Dulles, Virginia 20166.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require AOL to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the following account (the "Target Account"), including the contents of communications:

>       Account associated with e-mail address: billevans3@aol.com

2.      This affidavit is made in support of an application for a search warrant to require the Provider to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3.      I am a Special Agent with the United States Secret Service ("USSS"), and have been since September 2002. I graduated from the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia and the USSS Special Agent Academy in Beltsville, Maryland. Prior to joining the USSS, I was an Intelligence Officer in the United States Marine Corps for four years.

I have a Bachelor's Degree in Political Science with a minor/emphasis in Criminology. I am a law enforcement officer as that term is used in Federal Rule of Criminal Procedure 41 and am currently assigned to the Lexington, Kentucky Resident Office. My duties include investigating violations of federal laws constituting financial crimes.

4. As a USSS Special Agent, my responsibilities include the investigation of financial crimes, including wire fraud, 18 U.S.C. § 1343, money laundering, 18 U.S.C, §§ 1956, 1957, and conspiracy, 18 U.S.C. §§ 371, 1349, 1956(h). I also have jurisdiction to investigate commodities fraud, in violation of 7 U.S.C. §§ 1-26.

5. I obtained the information set forth below from consultation with other credible law enforcement personnel, victim and witness statements, review of records received via the issuance of federal subpoenas, review of publicly filed documents, and an investigative interview of William S Evans ("Evans"), who is a target in this investigation, by USSS Senior Special Agent Matthew Mann and Chad Harlan, Enforcement Branch Manager of The Kentucky Department of Financial Institutions. I have substantiated this information through witness interviews and document examination obtained via federal grand jury subpoenas and search warrants executed on Evans's office space and residence, and two devices found therein. These searches yielded documents substantiating Evans's use of the Account in furtherance of his illegal activity. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

6. As part of this investigation, I talked to the Commodity Futures Trading Commission ("CFTC"). The CFTC officials have explained that the term "commodity pool" means "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests, including any—(i) commodity for future delivery, security futures

product, or swap; (ii) agreement, contract, or transaction described in section 2(c)(2)(C)(i) or section 2(c)(2)(D)(i); (iii) commodity option authorized under section 4c; or (iv) leverage transaction authorized under section 19" of the Commodity Exchange Act. 7 U.S.C. § 1a(10) (2018). A commodity pool operator ("CPO") is any person "engaged in a business that is of the nature of a commodity pool, investment trust, syndicate or similar form of enterprise and who, in connection therewith, solicits, accepts, or receives from others, funds, securities or property . . . for the purpose of trading in commodity interests." U.S.C. § 1a(11)(2018). To lawfully place trades in connection with its business as a CPO, through the use of the mail or any instrumentality of interstate commerce, a CPO must register with the CFTC. 7 U.S.C. § 6m(1). Moreover, it is unlawful for a CPO to use the mail or any means or instrumentality of interstate commerce to defraud any client, participant, or prospective client or participant, or to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client, participant, or prospective client or participant. 7 U.S.C. § 6*o*. A CPO, or someone required to be registered as such, is subject to imprisonment for not more than 10 years and a fine of $1,000,000, for committing such offenses described herein. 7 U.S.C. § 13(a)(5).

7. Detective Michael Helsby with the Lexington Police Department ("Lex PD") and USSS Task Force Officer has also assisted in gathering and providing much of the information contained within this affidavit. Det. Helsby has worked for the Lex PD since September 2003. He has received extensive law enforcement training regarding proper investigative techniques, particularly in working with fraud related offenses. Det. Helsby has engaged in numerous state and federal investigations that relied heavily on evidence retrieved from electronic devices and servers.

8. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. §§ 1956 and 1957 (Money Laundering and Money Laundering Spending), and 7 U.S.C. §§ 6*o,* 13(a)(1) and (5) (Commodities fraud) (collectively, the "Specified Federal Offenses"), have been committed by the suspected user of the Target Account and others known and unknown. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, and contraband and fruits of these crimes, as further described in Attachment B.

## Oath, INC (AOL, INC).

8. AOL provides a variety of online services, including electronic mail ("e-mail") access, to the general public. AOL allows subscribers to obtain e-mail accounts at the domain names aol.com and aim.com, like the e-mail account listed in Attachment A. Subscribers obtain an account by registering with AOL. During the registration process, AOL asks subscribers to provide basic personal information. Therefore, AOL likely possesses stored electronic communications (including retrieved and unretrieved e-mail for AOL subscribers) and information concerning subscribers and their use of AOL services, such as account access information, e-mail transaction information, and account application information.

9. In general, an e-mail that is sent to an AOL subscriber is stored in the subscriber's "mail box" on AOL servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on AOL servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on AOL's servers for a certain period of time.

10. When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to AOL's servers, and then transmitted to its end destination. AOL often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-

mail from the AOL server, the e-mail can remain on the system indefinitely. Even if the sender deletes the e-mail, it may continue to be available on AOL's servers for a certain period of time.

11. A sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. If an e-mail user writes a draft message but does not send it, that message may also be saved by AOL but may not include all of these categories of data.

12. An AOL subscriber can also store files, including e-mails, instant messages, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by AOL.

13. Subscribers to AOL might not store on their home computers copies of the e-mails stored in their AOL account. This is particularly true when they access their AOL account through the web, or if they do not wish to maintain particular e-mails or files in their residence.

14. In general, e-mail providers like AOL ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit card or bank account number).

15. E-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via AOL's website), and other log files that reflect usage of the account. In addition, e-mail providers often

have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

16.     In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

17.     Based on my experience and training, I know that information stored in connection with an AOL account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of a crime or, alternatively, to exclude the innocent from further suspicion. As such, the information stored in connection with an AOL account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, web histories, email communications, contact lists, and images sent (and the data associated with the foregoing, such as date and time accessed or created) may indicate who used or controlled the account at a relevant time.

18.     Further, information maintained by the Provider can show how and when the account was accessed or used. For example, as described above, email providers typically log the IP addresses from which users access the email account along with the time and date. AOL may

log the IP addresses associated with the use of other services. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time. This is particularly important in cases involving foreign-located cybercriminals whose personal identification and location information is more difficult to obtain.

19. In my training and experience, I am further aware that, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Because AOL offers support services for its other applications, the same can be said for AOL account users communicating with support representatives for other applications. Providers of internet-based services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of those communications. In my training and experience, such information may constitute evidence of the crimes under investigation, because the information can be used to identify the account's user or users.

20. Lastly, stored electronic data may provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information in the AOL account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime) or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## **PROBABLE CAUSE**

21.     On May 14, 2020, members of the investigative team conducted a phone interview with Victims 1 and 2. During this phone interview, Victim 1 stated they had met William S. Evans while working at Logans of Lexington. Victim 1 stated they met Evans through an unnamed co-worker, who was familiar with Evans and his investing company. Victim 1 had current investments at Raymond James and Fidelity Investments. Victim 1 stated she was unhappy with their current investments as they did not have sufficient control of their money.

22.     Victim 1 had several further meetings with Evans, and then decided to invest with him and what he described as his company, Turning Point Investments. During these investment meetings with Victim 1, Evans provided three binders of investment related material and charts along with a contract to sign to begin investing. Victim 1 shared these binders and contract with Victim 2. These binders contained numerous graphs, charts, and other information that were obviously computer generated.

23.     Victim 1 stated during their meetings with Evans, they were shown Standard and Poor's 500 (SP500) investment graphs and charts. When Victim 1 was asked if they were provided investment advice from Evans, she stated that Evans had reviewed and discussed their current investments and provided her documents to review. Victim 1 stated that Evans only invested in the SP500 and had a small group of investors that he could manage more closely. Evans promised Victim 1 double-digit profits through trading, with a maximum risk of loss of 5-8%, and access to her funds on demand. As will be demonstrated below, Evans expended all of her money after pooling it with other investor funds and then unlawfully disposing of it into commodity trading accounts or personal expenditures.

24.     Victim 1 stated Evans purportedly met with clients once a year to review their investments. Victim 1 stated the compensation agreement with Evans is 2-3% of the total profit that is generated by all his investors. Victim 1 asked Evans about taxes and early withdrawal penalties from her retirement accounts, and Evans stated he has already set aside money to cover the taxes and can write them a check in 2021 to cover that amount.

25.     In January 2020, at the direction of Evans and based on his representations, Victim 1 requested that her retirement accounts be liquidated early and that approximately $227,000 and $773,000 be wired to an account at Central Bank listed as William S. Evans DBA Turning Point Investments, on which William and Frances Evans were both signers ("the DBA account").

26.     According to documents provided by Evans to Central Bank (*see* Paragraph 31), on February 2, 2020, Victim 1 signed a contract with William S. Evans that states, in part:

*"1.     In consideration of the parties having invested time and money in a common endeavor, the first party WILLIAM S EVANS III investing the expertise of which WILLIAM S EVANS III which only he possesses and the second party having invested money into the Turning Point Investments Central Bank business account (0904). It is agreed that if WILLIAM S EVANS III as party of the first part, should become incapacitated mentally or should die of natural causes, accidental or otherwise the following shall occur:*

*2.     The Trust and the estate of the party of the first part (William S Evans III), shall pay to the party of the second part the sum of $1,000,000 with in 120 days of the incapacitation of death of WILLIAM S EVANS III. This contact shall continue in existence for as long as the parties herein desire to continue the subject of contract.*

*3.      It is agreed that "Evans" shall use his best efforts to invest said funds through his S&P Futures Trading System, S&P Options trading system and Russell 2000 Trading system.*

*4.      William S Evans III will issue annual, as well as quarterly or every 6 months, a trade result report to clients."*

The contract makes no mention of a compensation agreement between William S. Evans and Victims 1 and 2.

27.     At a meeting between Victim 2 and Evans on or around March 7, 2020, Evans indicated he was not licensed. When Victim 2 asked Evans how he was able to invest other individuals' money if he was not registered to do so, Evans claimed he was only investing in futures and this did not require him to be registered. Consultation with the CFTC confirmed that he needed to be registered with the CFTC to solicit and accept Victim 1 and 2's funds to trade in a commodity pool, and he was not registered, putting him in violation of federal criminal law. Evans claimed that the profits he made from trading in February 2020 would have covered tax liability incurred as a result of premature distribution of Victim 1's retirement accounts. According to a review of his trading activity in February 2020 by the CFTC, however, he rarely achieved gains, and overall lost millions of dollars in his commodity trading accounts. Finally, Victim 2 stated that Evans refused to disclose the total dollar amount that is currently in the "fund".

28.     Recently, Victim 2 asked Raymond James employees to look into William S. Evans and his company prior to moving their investment funds. Raymond James employees advised Victim 2 that they were unable to locate any information on William S. Evans or Turning Point Investments.

29. A federal grand jury subpoena was issued to Central Bank & Trust Co. The return on this subpoena resulted in the identification of four (4) separate accounts active at Central Bank. The records show that between the dates of June 6, 2018, and April 7, 2020, $10,692,766.00 has been deposited, via check or wire, into the DBA account, including the funds from Victim 1 and 2. From our review of these records, it appears that each of the deposits making up the total of $10,692,766.00 into this account are from an unrelated third-party, and was pooled together. The investigative team has spoken with these depositors and confirmed that they, like Victims 1 and 2, were induced to invest with Evans on the promise of gains, low risk, and coverage of their tax and other liquidation penalties.

30. Instead, as mentioned above, Evans suffered significant losses on the commodity futures market. Thus, where he invested the money, unlawfully, he suffered losses. But Evans did not invest all the money he solicited from his "clients". At times, the money remained pooled in his bank accounts. Other times, he spent this money for his own personal gain. For example, once Victim 1's money was credited to the DBA account, the following money transfers took place:

| Date | Amount | First Transaction | Second Transaction |
| --- | --- | --- | --- |
| February 20, 2020 | $450,000.00 | Transfer from DBA account to the William S. Evans or Frances Evans Central Bank personal account ending in 1809 | On February 24, 2020, the same amount was sent to Ironbeam[1] investment account in the name of Frances Wombwell Evans, via check |

---

[1] According to its website, Ironbeam, located in Chicago, IL, is "cutting edge technology, support, and clearing services an FCM and futures broker providing to brokers and traders worldwide." See https://www.ironbeam.com/.

| Date | Amount | Description | Note |
|---|---|---|---|
| March 31, 2020 | $287,500.00 | Transfer from DBA account to the William S. Evans or Frances Evans Central Bank personal account ending in 9929 | On April 2, 2020, a check was issued for the same amount to Wallingford Law PSC[2] |
| Between February 20, 2020 and April 16, 2020 | $55,975.00 | Smaller increments transferred from DBA account to the William S. Evans or Frances Evans Central Bank personal account ending in 1809 | |
| April 16, 2020 | $1,200,000.00 | Transfer from DBA account, to the Williams Evans or Frances Evans Central Bank personal account ending in 1809 | On April 16, 2020, the same amount was sent to Ironbeam investment account in the name of Frances Wombwell Evans, via wire transfer |
| On May 7, 2020 | $2,650,000.00 | From DBA account, transfer to Central Bank account titled William or Frances Evans | On the same day, the same amount wire transferred to Ironbeam account in the name of Frances Wombwell Evans |
| May 13, 2020 | $2,550,000.00 | From DBA account, transfer to Central Bank account titled William or Frances Evans | On the same day, the same amount was wire transferred to Ironbeam account in the name of Frances Wombwell Evans. |

Thus, Evans transferred a significant amount of investor funds, which was pooled together in his personal bank account, to the Ironbeam account of Frances Wombwell Evans. According to the Frances Wombwell Evans account opening documents at Ironbeam, this account was being opened for her personal investment purposes. By placing this investor money in the personal trading account of Frances Evans, which, despite being a CPO, meant they did not have to certify themselves as registered brokers or pool operators, the Evanses were able to unlawfully trade pooled investor money on a commodities market without proper registration. Despite his

---

[2] The Wallingford Law Offices transfer was to pay for personal, civil litigation expenses.

representation to Victim 1 of guaranteed double-digit profits, information from the CFTC revealed that Evans incurred repeated losses of investors' money.

31. Further examination of the Central Bank accounts controlled by William S. Evans, Frances Evans, and Turning Point Investments show frequent transfers of investor funds from the DBA account to personal accounts controlled by William S. Evans or Frances Evans and then used for personal expenditures. For example, investor funds transferred from the DBA account to the Frances Evans Central Bank account *1809 were transferred on April 21, 2020, via a check to Huntington National Bank account in the amount of $355,000.00. This payment has been confirmed to have been applied to the mortgage / credit account belonging to Frances and William Evans.

32. The Central Bank Account records reflect that investor money deposited into the DBA Turning Point Investment account can also be traced to William S. and Frances Evans's personal accounts at Chase Bank, Health and Education Federal Credit Union, and the revocable trust account of William and Frances Evans. Evans does not show any additional employment income other than money entering the DBA account from investors; Frances Evans receives a small pension from the Fayette County Public Schools.

33. Review of these bank records show investor funds being deposited as early as November 13, 2013, and as recent as May 14, 2020.

34. In sum, there is probable cause to believe that Evans has committed federal criminal violations, by convincing investors through misrepresentations to invest vast sums of money with him and then either trading that money unlawfully or pilfering the money for personal expenditures.

35. According to Victim statements, William S. Evans principally met with his clients in person and over the phone. On July 23, 2020, an interview was conducted with "Victim 3" in regards to his investments with Evans. Victim 3 stated he invested $100,000.00 with Evans in December 2018. Victim 3 stated he was promised 15-16% profit with no loss to principle. As a result of Evans's representations, Victim 3 wrote a check for the amount of $100,000.00 to Turning Point Investments and provided the check to Evans.

36. On Friday December 21, 2018 @ 4:55pm, Victim 3 received an email response from Evans utilizing the billevans3@aol.com account. The email stated as follows:

*"[Redacted]- Great meeting you yesterday!. Your off an running to make 15-20%!. Like the puzzle illustration we talked about. YOU come up with some good questions, as we talked about. All your debts would be cleared up and college paid for by using your money, and my trading skills, makes a helluva team. Market tanked today and we made money, no brag just fact. You will have no principle reduction!. Will be <u>written</u> in final contact. YES this is new!! So keep an <u>open mind</u>. Hit the ball back in my court, to give you and Shannon the financial independence in 3-5 years and <u>no debt</u>!. You have the tools congratulations on winning, now the puzzle! Best Bill*

Trading analysis performed by the CFTC showed that in December 2018, Evans lost more than $14,000 on the commodity futures market trading, as he had for the prior two months. Victim 3 further stated that Evans attempted to convince them to liquidate two IRA accounts and invest the monies with him.

37. Other victims recalled that Evans communicated with them, often about setting up meetings, over email at the Target Address.

38. Investigators executed a search warrant for Evans Office space located at 1333 Alexandria Drive on May 29, 2020. During the execution of the search warrant a desk top all in one computer was seized. This computer is being forensically examined for evidentiary purposes and is believed to be the device that was used to communicate with Victim 3.

39. On July 6, 2020, Det. Helsby sent a grand jury subpoena to AOL (Oath) seeking the subscriber information of the Target Account. Agents are still awaiting the return of this information.

40. On February 27, 2015, Evans opened a WedBush Futures trading account with an account number showing EPLY2781. A review of bank records showed that Evans transferred investor money to his WedBush account. This account number has also been provided to agents from victims in this case, who had documentation demonstrating where their money was being invested from Evans. According to records lawfully obtained from WedBush, this account was opened the email address provided was billevans3@aol.com. Because most online trading accounts will send notifications of registration, updates and other notices, and trading confirmations to the registered email addresses, there is probable cause to believe that WedBush

41. After Raymond James began investigating what had happened with Victim 1 and 2's money with Evans, Betsy Williams with Central Bank reached out to Evans at the email address associated with his Central Bank account, billevans3@aol.com, asking for additional information related to his account activity. On May 3, 2020 at 8:27 pm, Evans emailed Betsy Williams with Central Bank from the billevans3@aol.com account. The email stated "*We can walk through tomorrow – Thanks, Bill.*" He also emailed Ms. Williams a copy of a contract with Victim 1 through this email address.

42. Thus, there is probable cause to believe that Evans committed the Specified Federal Offenses, and that evidence of those crimes will be located on the billevans3@aol.com account.

## **MANNER OF SEARCH**

43. As a federal agent, I am trained and experienced in identifying information relevant to the crimes under investigation. I also know that the manner in which the data is preserved and analyzed may be critical to the successful prosecution of any case based upon this evidence. Computer Forensic Examiners are trained to handle digital evidence. The Provider's employees are not. However, enabling law enforcement access to the Provider's vast networks for the relevant account would be unduly burdensome and impractical. In order to accomplish the objective of the search warrants with a minimum of interference with the business activities of the Provider, to protect the rights of the subject of the investigation, and to effectively pursue this investigation, authority is sought to allow the Provider to make a digital copy of the entire contents of the information subject to seizure specified in the accompanying Attachment A, to be provided to me or another authorized federal agent. The contents will then be analyzed to identify records and information subject to seizure as set forth in Attachment B.

44. Searching the Target Account for evidence of the Specified Federal Offenses will require that agents inspect all information produced by the Provider in order to ascertain which contain evidence of those crimes, just as it is necessary for agents executing a warrant to search a filing cabinet to conduct a preliminary inspection of its entire contents in order to determine the documents which fall within the scope of the warrant. In addition, keyword searches alone are inadequate to ensure that law enforcement can discover all information subject to seizure. Keywords search text, but many common e-mail, database, and spreadsheet application files (which files may have been attached to electronic mail) do not store data as searchable text.

## CONCLUSION

45. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Oath Inc. (AOL Inc.), which will then compile the requested

records at a time convenient to them, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

Respectfully submitted,

**Signed remotely per FRCP 4.1.  See addendum.**

Jason Kimmel, Special Agent
United States Secret Service

Subscribed and sworn to before me on August 26th, 2020.

_____
Honorable Matthew A. Stinnett
UNITED STATES MAGISTRATE JUDGE